UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LILER RAZOR GRIFFITH, Personal
Representative of the ESTATE OF
ARTHUR L. PARTEE, Deceased,

       Plaintiff,

                                   File No.  1:04-CV-728

v.

                                   HON. ROBERT HOLMES BELL

JIM COBURN, Police Chief for Benton
Township, TIM SUTHERLAND, WILLIAM
BRADSHAW, individually and in their
capacity as Benton Township Police Officers,
and BENTON TOWNSHIP, a municipal
corporation,

       Defendants.

_____/

## O P I N I O N

      This 42 U.S.C. § 1983 civil rights action is before the Court on the Defendants'

motions for summary judgment.  For the reasons that follow Defendants' motions will be

granted.

### I.

      Arthur L. Partee died on April 13, 2003, in the course of his arrest.  Plaintiff Liler

Razor Griffith, personal representative of the Estate of Arthur L. Partee, filed this action

against Benton Township Police Officers Tim Sutherland and William Bradshaw, alleging

excessive force, and against Benton Township Police Chief Jim Coburn, and Benton Township, alleging failure to train.

On April 13, 2003, Arthur Partee ("Partee") was a 27 year old male who lived with his mother, Ethel Lela Partee, at 777 East Napier, Apt. U-6, in Benton Township, Michigan. In the week leading up to April 13, 2003, Mrs. Partee became concerned about her son's mental health. Partee was acting strangely, not sleeping, making accusations, and behaving inappropriately. (E. Partee Dep. 18, 27-28, 40). Mrs. Partee was unable to convince Partee to check into the hospital, so she went to the Benton Township Police Department to request assistance in having him committed. (E. Partee Dep. at 29-30). Sutherland advised that he could not make Partee go to the hospital, but that he had an outstanding warrant on a traffic ticket that he could use to arrest and evaluate him. (E. Partee Dep. at 31; Sutherland Dep. at 15-16).

Officers Sutherland and Bradshaw went to the Partees' apartment and were met by Mrs. Partee in the hallway. Mrs. Partee invited them in, but asked them not to let her son know that she had requested them to come. When the two officers entered the room, Partee was sitting on the sofa. Sutherland told him he had a warrant for his arrest and attempted to verify his date of birth, but Partee refused to give information and repeatedly responded that the warrant was not for him. (Sutherland Dep. at 35-36; E. Partee Dep. at 32). Sutherland told him he was under arrest and ordered him to stand up and be handcuffed. Partee

continued to ignore him.  (Sutherland Dep. at 42-43).  Bradshaw moved the coffee table and Sutherland pulled his handcuffs from his pouch.  (Sutherland Dep. at 44).

Officers Sutherland and Bradshaw testified that Partee came up off the sofa, lunged towards Sutherland, and Sutherland pushed him back on the sofa.  (Sutherland Dep. at 47; Bradshaw Dep. at 27).  Mrs. Partee testified that Partee did not lunge at Sutherland, and that Sutherland just attacked Partee while he was still seated on the sofa.  (E. Partee Dep. at 26). Because this Court must view the conflicting testimony in the light most favorable to Plaintiff, for purposes of this opinion the Court will assume that Partee did not lunge at Sutherland.

The officers got on either side of Partee on the sofa and tried to force his hands out from under his body so that they could handcuff him.  (Sutherland Dep. at 53, 57-58; Bradshaw Dep. at 17-25).  Partee resisted their efforts.  Partee rolled from a sitting position to a kneeling position with his torso on the sofa and his arms tucked under his chest. (Bradshaw Dep. at 23, 27).   At one point Bradshaw was able to pull Partee's right arm out from beneath his chest area to behind his back, but Partee was "incredibly strong" and moved his arm right back.  (Bradshaw Dep. at 15).  Sutherland testified that during the struggle Partee reached for his gun and managed to unsnap one of the snaps on the holster. (Sutherland Dep. at 79-82, 124).  In response, Sutherland put Partee into a vascular neck restraint.  (Sutherland Dep. at 82).  According to Sutherland, after applying the vascular neck

restraint for two or three seconds, he was able to get control of Partee, to pull him off the sofa onto the floor, and to handcuff him. (Sutherland Dep. at 90-92).

Bradshaw did not see Partee reach for Sutherland's gun. (Bradshaw Dep. at 84-88). However, he was aware when Sutherland placed Partee into the vascular neck restraint because at that point the three of them rose up off the couch, Partee went limp, Bradshaw was able to get Partee's arm behind his back, and they all went to the floor. (Bradshaw Dep. at 34-35; 42-43).

Mrs. Partee's testimony corroborates the Officers' recollection of the struggle in most significant respects. Mrs. Partee described the struggle as follows:

> After he got his handcuffs out, Arthur had his arms on the couch and he was laying back, and he got his handcuffs out and got on him and tried to put his arm behind his back, and he was refusing to help, you know, resisting it, and they wrestled him, and he had his arm around his neck, all the time, like that (indicating), and Arthur hollered help.

(E. Partee Dep. at 34-35). Mrs. Partee explained what Arthur was doing to resist the officers:

> Holding back, holding back, he was strong; he was strong. He just was resisting them with his strength, you know, like for instance I'm trying to pull you up and I don't go up, I'm resisting.

(E. Partee Dep. at 35). One of the officers took out the pepper spray, but put it away when Mrs. Partee hollered at him not to spray Partee's eyes. (E. Partee Dep. at 40). One of the officers had his arm around Partee's neck, with his elbow pointing away from Arthur's face. (E. Partee Dep. at 37). Partee yelled for help after the officer's arm was around his neck. (E. Partee Dep. at 38). The officers were wrestling with Arthur for about two to three

minutes. (E. Partee Dep. at 36). The officers did not punch or kick Partee. (E. Partee Dep. at 39).

The dispatch tape confirms the limited duration of the struggle. Sutherland requested back up at 21:29:07 because "they were fighting one." (Def. Ex. 3 at 13; Sutherland Dep. at 68). Approximately two and a half minutes later, at 21:31:42, Sutherland called dispatch again and advised that the subject was in custody. (Def. Ex. 3 at 14).

After handcuffing Partee, the officers were tired and breathing heavily. (Sutherland at 101-03; Bradshaw at 72, 78). Partee rolled himself over onto his right side, his eyes were open, he was breathing, and he was not completely limp. (Sutherland Dep at 95, 111-12; Bradshaw Dep. at 78). Within a minute, as the officers were catching their breath, Officer Koza arrived. (Sutherland Dep. at 100; Bradshaw Dep. at 70, 76). Koza attempted to help Bradshaw lift Partee up, but noticed some blood on Partee's arm and went to his car to obtain gloves. (Bradshaw Dep. at 73-74). Bradshaw noticed that Partee did not seem to be breathing as heavily as the officers. (Bradshaw Dep. at 78-79). While Koza was out, Sutherland noticed that Partee's breathing seemed to be deteriorating. (Sutherland Dep. at 114-16). At 21:34.57, approximately three minutes after he called dispatch to advise that the subject was in custody, Sutherland called for an ambulance. (Incident Rpt. at 14). Fifteen seconds later, at 21:35:12, Sutherland called dispatch again, advising that there was a medical problem and requesting the medic to "step it up." (Incident Rpt. at 14; Sutherland Dep. at 116).

The officers put ammonia under Partee's nose and he jerked back, but then went back to being silent.  (Bradshaw Dep. at 82-83).  Sutherland tried rubbing Partee's sternum, but got little reaction.  The officers checked for and found a pulse.  (Bradshaw Dep. at 84).  Bradshaw uncuffed Partee, laid him on his back and the officers started CPR.  (Bradshaw Dep. at 84).  When the medics arrived they continued to try to revive Partee but their efforts were unsuccessful.   Partee was taken to the hospital where he was pronounced dead.

Again, Mrs. Partee's testimony substantially corroborates the officers' testimony of what occurred after they got Partee handcuffed on the floor:

> After that they went to the floor, and he was down, face first on the floor, and they said he wasn't breathing, so they turned him over and said he is just faking; they do this some time, and I was hollering and screaming, and they snapped – slapped him, like that (indicating), and they said call medics, call the ambulance, and he wasn't breathing, al [sic] all, when they left out of the apartment with him.

(E. Partee Dep. at 35).

Dr. Start performed the autopsy on Arthur Partee.  On the death certificate he listed the cause of death as asphyxia associated with physical restraint and acute psychotic mania.  Dr. Start explained that he used the term asphyxia in its broadest sense to mean lack of oxygen to the brain, whether through compression of the airway or compression of the blood vessels.  (Start Dep. at 24).  In this case there was no evidence of airway compression.  (Start Dep. at 32).  Dr. Start's second diagnosis was acute psychotic mania.  In connection with this diagnosis Dr. Start took into consideration Arthur Partee's history of bizarre, psychotic-type behavior.  (Start Dep. at 27).  Dr. Start explained that psychotic individuals who become

agitated can be predisposed to a sudden cardiac arrhythmia on the basis of elevated levels of epinephrine. (Start Dep. at 27). Dr. Start opined that asphyxia was the primary cause of death but that the acute psychotic mania was a contributing factor to the death as well. (Start Dep. at 28).

Plaintiff filed this wrongful death action against Officers Sutherland and Bradshaw, Police Chief Coburn, and Benton Township. This matter is currently before the Court on motions for summary judgment filed by Jim Coburn and Benton Township and by Defendants Sutherland and Bradshaw.

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If Defendants carry their burden of showing there is an absence of evidence to support a claim then Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

"On summary judgment, all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the parties opposing the motion." *Hanover Ins. Co.*

*v. American Eng'g Co.*, 33 F.3d 727, 730 (6th Cir. 1994) (citing *Matsushita*, 475 U.S. at 586-88). Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for Plaintiff. *Id. See generally, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

### III.

In Count I Plaintiff alleges a deprivation of constitutional rights by Officers Sutherland and Bradshaw "including but not limited to, his rights under the Fourth and Fourteenth Amendments to be secure in his person, to be free from the use of deadly force, to be free from punishment without due process, and to equal protection of the laws." (Compl. ¶ 26). Although Plaintiff alleges the violation of multiple constitutional protections, the clear essence of Plaintiff's complaint is that these officers used excessive force in executing the arrest of Partee. Plaintiff has not alleged any facts to support an equal protection claim. To the extent Plaintiff is suggesting a substantive due process claim, it is well settled that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing' such a claim." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

Accordingly, the Court will analyze Plaintiff's claims against Defendants Sutherland and Bradshaw as an excessive force or unreasonable seizure claim under the Fourth Amendment as made applicable to the states by the Fourteenth Amendment.  *See Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005) (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)).

Defendants Sutherland and Bradshaw have moved for summary judgment on the basis of qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In reviewing Defendants' claim for qualified immunity, this Court employs a three-step inquiry:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff[] show that a constitutional violation has occurred.  Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known.  Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Sample v. Bailey*, 409 F.3d 689, 695-96 (6th Cir. 2005) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).[1]  "Qualified immunity must be granted if the plaintiff cannot

---

[1]Although the Sixth Circuit sometimes employs a two-step qualified immunity analysis, the Sixth Circuit has indicated that both approaches capture the holding of *Saucier v. Katz*, 533 U.S. 194 (2001).  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 n.2 (6th Cir. 2005).

establish each of these elements." *Sample*, 409 F.3d at 696 (citing *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005)).

The first step requires the Court to determine whether the facts, viewed in the light most favorable to Plaintiff, show that a constitutional violation has occurred.  Under the Fourth Amendment, officers may only use such force as is "objectively reasonable" under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989).  In making this evaluation, the Court must give careful attention to the facts and circumstances of the particular case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 397.

The undisputed facts of this case reveal that the officers entered the apartment at the request of and with the consent of Mrs. Partee; that the officers had a valid warrant for the arrest of Partee; that Partee refused their requests to arrest him peaceably; and that Partee actively and physically resisted arrest.  There is also no dispute that officers are entitled to use some force in effectuating an arrest of an individual who is actively resisting arrest.

There is no evidence that the officers used gratuitous force against him, or that they continued to use force against him after he had been neutralized. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004) (noting that types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly established right). The only question presented is whether the officers' use of the vascular neck restraint was excessive under the circumstances.

Although the results of the attempted arrest in this case are profoundly unfortunate, it is important at the outset not to improperly or unfairly characterize this as a case where lethal force was used to effectuate an arrest on a misdemeanor traffic warrant. That is not what the undisputed facts reveal. Understanding the officers' conduct in this case requires an understanding that Partee was actively resisting arrest, and that the vascular neck restraint is not considered deadly force.

At the police academy Defendants Sutherland and Bradshaw were trained in Pressure Point Control Tactics ("PPCT"), including the Lindell Neck Restraint System, a vascular neck restraint. The PPCT Student Manual distinguishes the lateral vascular neck restraint from the bar-arm/respiratory technique. The respiratory neck restraint involves compression of the trachea. It is "a dangerous and potentially lethal subject control technique" and "should be considered deadly force." (PPCT Manual at 7-1). By contrast, the lateral vascular neck restraint involves compression of the outside of the neck instead of the trachea. (PPCT Manual at 7-1-2). "[T]he vascular neck restraint when used correctly, is one of the safest and

reliable subject control techniques that was developed specifically for high level resistance."
(PPCT Manual at 7-1). When the manual was written, the Lindell Neck Restraint System
had a track record of no deaths or injuries since its development in 1970. (PPCT Manual at
7-1).

Officer David Headings trained Defendants in the vascular neck restraint. (Bradshaw
Dep. at 11-12; Headings Dep. at 10-12). Headings explained that an officer has many
options at his disposal for the use of force. The options range on a continuum from verbal
commands at one end, to deadly force at the other end. (Headings Dep. at 54-55). The
vascular neck restraint is a technique that one would use "on the higher end of the scale of
resistance." (Headings Dep. at 61). The PPCT Defensive Tactics Student Manual describes
the force considerations associated with the vascular neck restraint:

> The Lateral Vascular Neck Restraint system taught, is designed to control high
> levels of resistance, by applying pressure to the sides of the neck with a low
> potential for injury to the offender, when higher levels of control would be
> justified. This type of restraint has essentially no medical complications, but
> because of the probability of mental disorientation in the subject, the Lateral
> Vascular Neck Restraint is classified as Hard Empty Hand Control.

(PPCT Manual at 7-7). Headings testified that the vascular neck restraint would not be used
"on someone who is just sitting there, and saying "I'm not going." (Headings Dep. at 33).

Plaintiff contends that because Partee kept his arms to his chest and used only passive
resistance, there is a question of fact as to whether the use of the vascular neck restraint was
justified or excessive.

The actions of Partee cannot be characterized as "passive" or "just sitting there." Partee began with passive resistance, but the officers' testimony that his resistance became very active when they tried to put the handcuffs on him is unrefuted.  Sutherland, Bradshaw and Mrs. Partee were the only witnesses to this event.  They all agreed that Partee was exceptionally strong and used his strength to resist the officers' efforts to place the handcuffs on him.  (E. Partee Dep. at 35; Sutherland Dep. at 74; Bradshaw Dep. at 15, 19, 22).  Two officers struggled with him for several minutes before they were able to subdue him and handcuff him.  That is not passive resistance.

Headings testified that if an individual refuses to put their hands behind their back for arrest, and then pulls away from the officer who grabs his hands, the officers could use his baton, pepper spray, taser, or the vascular neck restraint.  (Headings Dep. at 57).

In addition, there is evidence that during the struggle Partee reached for Sutherland's gun.  Sutherland testified that during the struggle he was pinned against the corner of the sofa with his arm pinned down by the weight of Partee's body.  Sutherland saw Partee's left arm come out from under him and he felt Partee's hand on his gun.  When Sutherland reached for Partee's hand, Partee pulled his hand back underneath him.  (Sutherland Dep. at 77-82). Sutherland testified that at this point he decided to use the vascular neck restraint. (Sutherland Dep. at 82).  Contrary to Plaintiff's assertions, the credibility of Sutherland's testimony regarding the unsnapping of his holster is not undermined by his written report created shortly after the incident.  Sutherland's testimony is consistent with his written report

which stated that "[a]t one point during the struggle A. Partee was able to unsnap one of R/O's two snaps that holds in side arm."  (Pl. Ex. 15 at 0038).

Neither Mrs. Partee nor Bradshaw witnessed Partee grabbing for the gun.  They have not, however, refuted Sutherland's testimony.  Bradshaw did not see Partee reach out or unsnap Sutherland's holster.  (Bradshaw Dep. at 36-37).  However, Bradshaw explained that he was on the opposite side of Partee and in a constant struggle with him to get his arm behind his back.  (Bradshaw Dep. at 38-42).  The inability of Bradshaw or Mrs. Partee to corroborate Sutherland's testimony is not sufficient to raise an issue of fact as to the credibility of Sutherland's testimony.  Each of the witnesses viewed the struggle from a different position.  "This sort of minor conflict of perception is common, and is not sufficient by itself to create a material dispute of fact as to the officers' credibility."  *Gaddis v. Redford Twp*, 364 F.3d 763, 773 (6th Cir. 2004).  There is no evidence to contradict Sutherland's testimony.

Headings testified that if the person who is being arrested reaches for the officer's gun, the officer is justified in using greater force than the vascular neck restraint, even deadly force.  (Headings Dep. at 58).  Headings' testimony is consistent with Supreme Court authority.  In *Tennessee v. Garner*, 471 U.S. 1 (1985), the Supreme Court held that police officers may use deadly force "if the suspect threatens the officer with a weapon." *Id.* at 11. In addition, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally

14

unreasonable to prevent escape by using deadly force." *Id.* By reaching for the gun, Partee posed a threat of serious physical harm to the officer and to others, and his actions accordingly justified the use of deadly force. If his actions justified the use of deadly force, they also justified the use of less than deadly force, such as the vascular neck restraint.

Even if the use of the vascular neck restraint was appropriate under the circumstances, the Court must address Plaintiff's contention that the officers applied pressure to Partee's neck for approximately one and a half to two minutes, far longer than the four to seven second application they were taught.

Defendants were taught that when the vascular neck restraint is applied, control is normally established within four to seven seconds. (PPCT Manual at 7-7). When resistance stops the restraint is immediately relaxed. (PPCT Manual at 7-6, 7-7). The Manual teaches that "vascular neck restraints are justified when the officer's attempt at lower forms of subject-control has failed, or when the officer believes that lower forms of subject-control would not be successful." (PPCT Manual at 7-5).

The Manual also addresses reviving a individual rendered unconscious through the use of the vascular neck restraint:

> If rendered unconscious, the offender should regain consciousness within 5-30 seconds. An officer can attempt to revive a subject by raising him to a seated position, and delivering a sharp slap between the subject's shoulder blades.

(PPCT Manual at 7-7).

The proper technique for the vascular neck restraint is to have the elbow directly over the sternum. (Headings Dep. at 28, PPCT Manual at 7-6). This is the same position Mrs. Partee observed, (E. Partee Dep. at 37). The autopsy found no evidence of injury to the trachea such as would be evident if Partee had been choked. (Start Dep. at 32). There is evidence to suggest that Sutherland had some difficulty applying the neck restraint in light of Partee's resistance. Although Headings testified that "[t]his technique stops that flow of blood going into the brain, and within three to seven seconds, the person goes unconscious," (Headings Dep. at 26), he also indicated that the ability to apply the vascular neck restraint may be impacted by a suspect who is wiggling or moving or resisting. (Headings Dep. at 59). Dr. Start testified that in order to cause death through the use of the vascular neck restraint one would have to maintain the pressure on the neck for a period of time, somewhere in the range of two to five minutes, or between 90 seconds and two minutes after the victim becomes unconscious. (Start Dep. at 34, 49-50).

If an officer held an individual in a vascular neck restraint for an extended period of time after the victim becomes unconscious, that action would be evidence of the use of excessive force. However, there is simply no evidence in this case to support a finding that Sutherland maintained the pressure on Partee's neck for a significant time after Partee lost consciousness.

None of the witnesses suggested that the neck restraint was maintained after Partee lost consciousness or became limp. Sullivan estimated that he maintained the restraint for

two or three seconds.  (Sutherland Dep. at 90).  His estimate is not contradicted by either Mrs. Partee or by Bradshaw.  During the whole time, Partee was pulling and struggling with the officers.  (Bradshaw Dep. at 40).  Sometime during the struggle Sutherland initiated efforts to use the vascular neck restraint.  Bradshaw testified that he felt Sutherland apply the neck restraint, because they all rose up off the couch.  Bradshaw was able to get Partee's arm behind his back, and they all simultaneously went to the floor.  (Bradshaw Dep. at 34-35; 42-43).  Bradshaw does not know how long Sutherland had Partee in the neck restraint because he was struggling with him, but he did know that they took him to the ground within seconds.  (Bradshaw Dep. at 106).  "I mean it just happened so quickly, it was like boom."  (Bradshaw Dep. at 106).  Both Mrs. Partee and Bradshaw described an ongoing struggle at the end of which the officers obtained sufficient control to pull Partee off the couch and to handcuff him.  (E. Partee Dep. at 34-35; Bradshaw Dep. at 34-35, 42-43).  The entire struggle lasted 2-3 minutes.  (E. Partee Dep. at 36).  During the struggle Sutherland asked for backup.  (Bradshaw Dep. at 39).

The calls to dispatch confirm that Partee was struggling when the call was made and he was in handcuffs two and a half minutes later.  (Incident Rpt. at 13-14).  When Sutherland put the handcuffs on Partee and called for a medic Partee was still breathing.  (Sutherland Dep. at 99, 112).  After the cuffs were on he was pulling against the cuffs and moving his arms around.  (Sutherland Dep. at 100).  The Court finds no evidence to support Plaintiff's

contention that Partee was held in the vascular neck restraint for a minute and a half or more after Partee was limp and subdued.  (Pl. Br. in Opp. at 11-12).

Finally, even if a court were to find that there is a question of fact as to whether Partee reached for Sutherland's gun, and even if a court were to find that the officers' application of the vascular neck restraint violated Partee's constitutional rights, there has been no showing that such a right was clearly established or that the officer's actions were objectively unreasonable in light of the clearly established constitutional rights.  *Sample*, 409 F.3d at 695-96 (6th Cir. 2005).

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.  *Saucier v. Katz*, 533 U.S. at 206, 121 S. Ct. 2151 (qualified immunity operates "to protect officers from the sometimes 'hazy border between excessive and acceptable force'").  Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.  If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

*Brosseau v. Haugen*, 543 U.S. 194, 125 S. Ct. 596, 599 (2004).

> *Brosseau* leaves open two paths for showing that officers were on notice that they were violating a "clearly established" constitutional right – where the violation was sufficiently "obvious" under the general standards of constitutional care that the plaintiff need not show "a body" of "materially similar" case law, *id.*, and where the violation is shown by the failure to adhere to a "particularized" body of precedent that "squarely govern[s] the case here," *id*. at 599-600.

*Lyons v. City of Xenia,* 417 F.3d 565, 579 (6th Cir. 2005).

Benton Township has no policy prohibiting the us of the vascular neck restraint. (Coburn Dep. at 26-27).   Accordingly, Sutherland did not violate any of the Benton Township Police Department's policies when he applied the vascular neck restraint.   Neither has Plaintiff pointed to any cases that have prohibited the use of the vascular neck restraint under the factual circumstances presented in this case.   There simply was no clearly established law prohibiting the use of the vascular neck restraint under the circumstances of this case.  A reasonable officer in Sutherland's position could reasonably have believed it was proper to apply the vascular neck restraint on a plaintiff who was actively resisting arrest. *See Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002) ("Given the fact that Lt. Barber was simply following established departmental procedures for dealing with non-cooperative arrestees, we do not think he should be deemed to have known that his conduct might be illegal.).

The use of the vascular neck restraint under the circumstances was not objectively unreasonable.  Accordingly, Defendants Sutherland and Bradshaw are entitled to qualified immunity and to the dismissal of Plaintiff's excessive force claim.

## IV.

In Count II Plaintiff alleges a deprivation of constitutional rights by Police Chief Coburn and Benton Township.  Specifically, Plaintiff claims that these Defendants failed to provide their officers with adequate training and supervision regarding appropriate neck

restraint methods during an arrest, and that this failure amounted to deliberate indifference to the safety and lives of the citizens of the State of Michigan. (Compl. ¶¶ 33 and 40).

A municipality cannot be held liable under § 1983 under a theory of *respondeat superior* for the actions of its employees. *Monell v. Dept. of Soc. Servs. of New York City*, 436 U.S. 658, 691 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. Even if an individual officer is entitled to qualified immunity, the municipality may nevertheless be liable under § 1983 if its policy was the "moving force" behind the constitutional violation. *Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005).

In light of this Court's determination above that the officers on the scene did not engage in any constitutional violation, there can be no liability on the part of the Chief of Police or the Township. However, for purposes of the motion filed by Defendants Coburn and Benton Township, the Court will assume that the facts are sufficient to raise at least a question of fact as to the existence of an underlying constitutional violation by the officers.

The inadequacy of police training may serve as the basis for § 1983 liability, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). "Only where a

municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* (quoting *City of Canton*, 489 U.S. at 389).

The Sixth Circuit has recognized two situations in which inadequate training could be found to be the result of deliberate indifference: 1) "failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction," and 2) failure "to act in response to repeated complaints of constitutional violations by its officers." *Cherrington*, 344 F.3d at 646 (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)).

The evidence is unrebutted that these officers were trained in the vascular neck restraint. Although Plaintiff asserts that "Chief Coburn conceded that Officers Sutherland and Bradshaw did not have any training prior to this incident in the lateral vascular neck restraint or encountering, approaching, and arresting emotionally disturbed persons," (Pl. Br. in Opp. at 10), this assertion mischaracterizes Chief Coburn's testimony. Chief Coburn merely testified that he had not provided these officers with any in-service training on these topics. (Coburn Dep. at 22-23).

The evidence is unrebutted that these officers graduated from the Police Academy at the Kalamazoo Valley Community College,[2] and that their training at the Police Academy

---

[2]Sutherland graduated from the Police Academy in 1993. (Sutherland Dep. at 10; Def. Ex. 7). Bradshaw graduated from the Police Academy in 1995. (Bradshaw Dep. at 50; Def. Ex. 8).

included training in the use of the vascular neck restraint.  (Sutherland Dep. at 83-88, 120-21; Bradshaw Dep. at 10-12, 46, and 50; and Ex. 7 & 8).  The PPCT Manual they used was reviewed and approved by the state certifying authority, the Michigan Law Enforcement Training Council. (Headings Dep. at 12).  This is the same manual Plaintiff cites and relies on as the authoritative guide on this technique.  (Pl. Ex. 13).

Plaintiff does not quarrel with the adequacy of the officers' training at the academy, but contends that they should have received additional in-service training from the Township. Plaintiff has offered no authority that would suggest that the need for post-academy training on the vascular neck restraint is so obvious that police departments would be acting with deliberate indifference if they failed to conduct further training.  Neither has Plaintiff offered any evidence that the Township received any complaints or was otherwise on notice that its officers were inadequately trained in the vascular neck restraint system.  Absent such evidence that would put the Township on notice of a need for training, no reasonable jury could find that the Township acted with deliberate indifference in failing to offer additional training.  Because there is no evidence that the township was on notice that the training was inadequate the Township and Chief Coburn are entitled to summary judgment on Plaintiff's failure to train claim.

An order and judgment consistent with this opinion will be entered

Date:     November 15, 2005                /s/ Robert Holmes Bell
                                           ROBERT HOLMES BELL
                                           CHIEF UNITED STATES DISTRICT JUDGE